# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**BRENDA FROHLIGER,**

    **Plaintiff,**                      **Case No.:**

**v.**

**FLORIDA MEDICAL CLINIC, LLC,**

    **Defendant.**

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff, BRENDA FROHLIGER, by and through her undersigned counsel and sues the Defendant, FLORIDA MEDICAL CLINIC, LLC, (hereinafter referred to as "Defendant") and states as follows:

## JURISDICTION AND VENUE

1.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, and 1367.

2.     Venue lies within the United States District Court for the Middle District of Florida, Tampa Division because a substantial part of the events giving rise to this claim occurred in this Judicial District and is therefore proper pursuant to 28 U.S.C. 1391(b).

## PARTIES

3.      Plaintiff, BRENDA FROHLIGER, is a resident of Pasco County, Florida.  At all times material, Plaintiff was an employee of Defendant within the meaning of the Americans with Disabilities Act (ADA), the Florida Civil Rights Act (FCRA), and the Family and Medical Leave Act (FMLA).

4.      Defendant, FLORIDA MEDICAL CLINIC, LLC is a Florida Limited Liability Company authorized and doing business in this Judicial District.  At all times material, FLORIDA MEDICAL CLINIC, LLC employed Plaintiff.  At all times material, FLORIDA MEDICAL CLINIC, LLC employed the requisite number of employees and, therefore, is an employer as defined by the ADA, FCRA, and FMLA.

## ADMINISTRATIVE PREREQUISITES

5.      On September 2, 2020, Plaintiff timely filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

6.      On April 29, 2021, the EEOC issued a Dismissal and Notice of Rights related to Plaintiff's Charge of Discrimination.  This Complaint is filed within ninety (90) days of the issuance of the Dismissal and Notice of Rights; therefore, Plaintiff has met all conditions precedent to filing this Complaint.

7.     Plaintiff has satisfied all conditions precedent, therefore jurisdiction over this claim is appropriate pursuant to Chapter 760, *Florida Statutes*, because more than one-hundred and eighty (180) days have passed since the filing of the Charge.

## GENERAL ALLEGATIONS

8.     At all times material, Defendant acted with malice and reckless disregard for Plaintiff's federal and state protected rights.

9.     At all times material, Plaintiff was qualified to perform her job duties within the legitimate expectations of her employer.

10.     Plaintiff has retained the undersigned counsel to represent her in this action and is obligated to pay them a reasonable fee for their services.

11.     Plaintiff requests a jury trial for all issues so triable.

## FACTUAL ALLEGATIONS

12.      Plaintiff is a 60-year-old female and a nurse for over 30 years who suffers from disabilities including end-stage osteoarthritis, gait disturbance, chronic leg pain, fibromyalgia, and asthma.

13.     On or about April 17, 2017, Plaintiff began her employment with Defendant as an Endoscopy Registered Nurse, working at its Zephyrhills Ambulatory Surgery Center (ASC).

14.     In or around October 2017, Plaintiff was offered the Perioperative Assessment Registered Nurse ("PAT") position by Shelly Harris (ASC Clinical Manager, then ASC Facility Director in November 2019) because Plaintiff was having gait problems while working in her Endoscopy RN position.  Harris made it clear that the PAT position was good for Plaintiff because it would get Plaintiff off working the floor, which Plaintiff appreciated.  Harris told Plaintiff that if Plaintiff wanted to go to the floor and start an occasional IV to keep her skills sharp that Plaintiff could and further told Plaintiff that she would never be required to work the floor again while in the PAT position.

15.     As a PAT, Plaintiff's job was to provide and complete documentation for all pre-op assessments on scheduled patients, along with clarifying patient information and communicating anesthesia issues with schedulers.  According to Plaintiff's job description, the essential functions of her PAT job were/are:

(a)     Collecting current schedule and booking sheets on all scheduled cases;

(b)     Staying 8 days to 2 weeks ahead in calls;

(c)     Confirming patient, procedure, and surgeons;

(d)     Maintaining documentation of all activities; and

(e)     Maintaining training requirements.

16.     The "additional responsibilities," which were/are not part of the essential functions, state: "Performs other incidental and related duties as required and assigned."   Under the physical and mental demands, the job description states: "Ability to sit for long periods of time."   It does not note anything further in terms of physical demands.

17.     For more than two and one-half years in the PAT position, Plaintiff was praised for her work, received the highest level of pay raises, and understood that she was doing a good job and was appreciated by her supervisors.   During those two and one-half years, Plaintiff was never asked to work on the floor and was never told that her job included working the floor or any other areas.

18.     On January 9, 2020, Plaintiff provided Defendant a doctor's note indicating: "Pt. unable to do any floor nursing sitting only."   The reason for the doctor's note was because Plaintiff was assigned to do YAG capsulotomies ("YAGS") with an ophthalmologist each Wednesday, which was never a problem until Plaintiff had to do six in one day, which became a challenge for Plaintiff physically as it is a standing/walking/bending position that requires the RN to be fully ambulatory at a quick pace for well over 2 hours without a break when there are over four patients booked in that time frame.   Plaintiff spoke to Harris and she assured Plaintiff that the note was all that she needed.

19.     However, on January 16, 2020, Alex Tabler (Benefits Coordinator) provided Plaintiff with ADA accommodations paperwork for Plaintiff's doctor to complete.

20.     On or about January 27, 2020, Plaintiff's physician submitted the ADA paperwork indicating that Plaintiff's only limitation was prolonged standing and that she could perform her job duties without accommodation. From there, Plaintiff remained in her PAT position doing the job that she had been doing for the prior two and one-half years.

21.     Harris was aware that Plaintiff needed to have a right hip replacement.  In or around December 2019, Plaintiff informed Harris that her hip replacement was going to be scheduled as soon as Plaintiff saw the surgeon on March 9, 2020.

22.     The surgery was booked for June 16, 2020, but Harris also knew that Plaintiff was in the process of adopting a child and she would be taking two weeks of Family and Medical Leave Act (FMLA) leave when she was able to start in-home visits. Harris suggested Plaintiff fill out FMLA paperwork for the adoption, even though Plaintiff did not know the precise dates and indicated that they could adjust the dates when necessary.  The surgery was later cancelled due to the cancellation of elective surgeries during the COVID -19 pandemic.

23.     On March 23, 2020, Plaintiff was furloughed by Defendant due to the COVID-19 pandemic and was scheduled to return to work on May 11, 2020. However, on May 7, 2020, Plaintiff took approved medical leave for her serious health condition (Asthma) as she had risk factors related to COVID-19, with a return date of June 1, 2020.

24.     While Plaintiff was on medical leave, she understood that Patricia Shaw (RN) would cover her position since Shaw helped Plaintiff in the PAT office occasionally.  However, Defendant hired Mary Jo R. (last name unknown, PRN Registered Nurse) without Plaintiff's knowledge.  During that time, Defendant's work schedules show that Mary Jo R. (l/n/u) was performing Plaintiff's PAT job in Plaintiff's office in a full-time capacity.  Mary Jo R. (l/n/u) was the PAT for Defendant approximately four to five years ago.

25.     On May 27, 2020, Harris informed Plaintiff that Laura Kelley (Nurse Manager) would make arrangements for Plaintiff to either work in another office or at the front desk doing her PAT job upon Plaintiff's return because Defendant was training a new Registered Nurse.  Harris also noted that it was Defendant's policy to wear a mask.

26.     On May 28, 2020, Kelley sent Plaintiff the work schedule for her return to work.  Immediately, Plaintiff noticed that Mary Jo R. (l/n/u) was scheduled to do Plaintiff's job for three (3) days during that week.  Plaintiff asked Kelley why

there was another employee doing her job.  Kelley stated that Harris wanted Plaintiff to do screenings until the other nurse was trained.  Kelley further told Plaintiff that the screening job would entail being outside and taking the temperature of employees and patients and completing the related paperwork. Plaintiff expressed concern to Kelley about her asthma and the summer heat and Kelley told Plaintiff to stay outside as long as she could and if it got too hot to come to the front lobby area, but to try and stay outside until 8:00 a.m.  Kelley also told Plaintiff to bring a book because "your ass will be sore from sitting."

27.     On June 1, 2020, Plaintiff arrived at work and began performing the assigned temperature checks and paperwork.  At approximately 7:45 - 7:50 a.m., Plaintiff went inside due to the heat and related wheezing from her asthma. Shortly after 8:00 a.m., Harris approached Plaintiff and stated: "Laura told you to stay outside until 8am."  Plaintiff explained that Kelley permitted her to come in earlier if it became too hot.  Shortly thereafter, Plaintiff spoke with Kelley and asked her when she would be returning to her PAT position.  To Plaintiff's dismay, Kelley responded: "It's not your PAT job anymore, it's everyone's job."  Plaintiff asked her what she meant by that because "everyone" never did Plaintiff's job before.  Kelley stated that Harris "had to accommodate a lot of people" but Plaintiff should be back in her office the following week after Mary Jo R. (l/n/u) was trained.  Plaintiff asked why Mary Jo R. (l/n/u) was re-hired and Kelley told

her that Defendant "needed help."  Again, Plaintiff told Kelley that she did not understand why they needed help when it was Plaintiff's PAT job and she was ready to return.  At that point, Kelley stated: "well, we need to discuss this sitting you're doing."  Plaintiff asked Kelley what she meant and gave several examples of things that she did that entail standing and walking.

28.    Then, Kelley informed Plaintiff that she would be required to go in and out of the building for the rest of her shift to greet cars, find out who the car was there to pick up, and relay that information to the Endoscopy department. For approximately five (5) straight hours, Plaintiff was walking in and out of the building with very few breaks, despite her requests.  In fact, according to Plaintiff's Fitbit, she walked over two miles during that time.  As a result, Plaintiff began having severe pain in her legs.

29.    During her shift, Plaintiff again asked Kelley for an explanation as to why she did not have her PAT job anymore and inquired about the specifics of her job duties and responsibilities.  Kelley told Plaintiff that she did not know and that "we all have to work the floor."  Plaintiff told Kelley that she had never been required to work the floor in her PAT role.  Kelley shrugged her shoulders and told Plaintiff that Harris would explain it to her.  Plaintiff asked Kelley if it would be better for her to be off work until her job became available and she stated: "No, I am actually short on people for screening. I need you here to do this."  Prior to

Plaintiff's return on June 1, 2020, no one from Defendant told Plaintiff that she would be returning to a non-sitting position.

30.    After Plaintiff's shift, she sent a text message to Kelley and told her that she was in tears due to the pain from all of the walking/running she was required to do during her shift and explained that she needed to be in a position that would allow her to sit.  Kelley told Plaintiff that she would get back with her the next day.

31.    On June 2, 2020, Plaintiff received an email from Lipnisky stating that Defendant "reviewed your job requirements and issues in your role at the ASC and performed an interactive process to determine how we can meet your needs. Attached is our determination."  The attached letter noted that, while Plaintiff's position "is primarily a sitting position, having a restriction of sitting only is not a reasonable accommodation that we can meet."  The letter further stated that being a Registered Nurse required Plaintiff to be available for patient care and that all staff members of the ASC are expected to work in "multiple capacities."  The letter concluded by stating: "At this time we cannot make any further accommodations and suggest you consider applying for FMLA to allow you time to seek further medical treatment to enable you to meet the physical demands of your roles at the ASC."

32.     On June 3, 2020, Plaintiff worked for a few hours and was told via text by Harris to go home because Defendant got someone to cover Plaintiff's job duties for the day.  Plaintiff was also told to stay home until the matter of accommodating her disabilities was resolved and that Plaintiff needed FMLA papers to return to work.  Shortly thereafter, Plaintiff emailed Lipnisky, informed her of the situation, and asked that it be sorted out so she could return to work.

33.     Later that day, Plaintiff spoke with Harris.  Harris told Plaintiff that her job was no longer PAT and, in order to continue her employment with Defendant, she would have to work an 8-hour shift on her feet if another RN called in sick. Harris also told Plaintiff that, for years, she had been getting complaints from other employees about Plaintiff.  This was the first Plaintiff ever heard about such complaints and asked what they were in reference to.   Harris did not elaborate.  Additionally, Harris told Plaintiff that she would have duties in the Post-Anesthesia Care Unit (PACU), along with pre-op.  Harris kept telling Plaintiff that the PAT job was no longer hers and that all nurses had to work on the floor. Plaintiff was crying during the call and Harris stated: "Brenda, maybe it's time to cut your losses and move on."  Plaintiff told Harris that she would never quit her job.  Harris stated that Plaintiff had to be able to physically go to code and Plaintiff stated that she had attended three codes with Defendant and told Harris the details of the codes that she attended as a RN.  Plaintiff was so upset and crying,

that she asked Harris if there was any other job that she could do if PAT was not hers anymore, even if it meant a decrease in pay, as Plaintiff needed to work. Plaintiff told Harris that her husband is disabled, her son lived with her, and she is the breadwinner of the family.  Harris stated that there were no other jobs that Plaintiff could do.

34.     Following the phone call, Plaintiff sent Harris a text message and asked if Harris could send her something in writing outlining everything that she told Plaintiff over the phone.  Harris never did and, after this, Plaintiff did not hear from anyone at Defendant for several days.

35.     On June 8, 2020, Plaintiff spoke with Lipnisky by phone. Lipnisky claimed that Plaintiff had a conversation with Harris as to "what accommodations" Plaintiff was looking for.  Plaintiff explained to Lipnisky that she was not looking for any accommodation other than to be returned to her PAT position that she held prior to her leave.  Lipnisky stated that the "problem" was that, due to COVID-19, there were now more things that Plaintiff needed to do, including the duties assigned on June 1, 2020.  Plaintiff explained that she was not told about having to walk/run back and forth to the parking lot all day until she started her shift on June 1, 2020.  Lipnisky responded: "you're not able to walk at all or what are you saying?"  Plaintiff assured Lipnisky that she could walk and provided examples of walking tasks that she regularly performed in her PAT role.

Further, Plaintiff explained that she could stand or walk for about 1-2 hours per shift, but not all day. Lipnisky inquired about Plaintiff's June 3, 2020 conversation with Harris and Plaintiff explained the new job duties that Harris required. Lipnisky responded that those fell within the "other duties" in Plaintiff's job description. Plaintiff asked Lipnisky where they went from there and Lipnisky stated that Defendant was trying to "figure out" if it could accommodate Plaintiff.

36. Lipnisky asked if Plaintiff had a doctor's note outlining her restrictions and Plaintiff assured her that she could provide one. Plaintiff asked Lipnisky why FMLA leave would be beneficial because there is nothing to improve end-stage osteoarthritis and Plaintiff was able to fully perform her PAT position for two and one-half years without issue. Lipnisky stated that she did not know Plaintiff's condition, but if Plaintiff was having difficulty performing her job, then Defendant would have to put Plaintiff on FMLA. Again, Plaintiff told Lipnisky that she could perform her PAT job without accommodation but was now being told about a significant amount of new responsibilities for the first time. Plaintiff and Lipnisky discussed ways to avoid having to run outside to each car and how primary care was utilizing text messages to update people on patients. Lipnisky said she would speak with Harris to see if that was a feasible solution.

37. Plaintiff asked Lipnisky if she was being terminated from her job. Lipnisky told Plaintiff that she was not, and that Defendant was offering Plaintiff

FMLA leave so Plaintiff would have time to "get this worked out."  Plaintiff asked Lipnisky about other available jobs with Defendant, including the PRN PAT position that was posted.  Lipnisky stated that there were no jobs within Defendant for Plaintiff and that Plaintiff "obviously" could not do the PRN PAT job.

38.     Following the call, Plaintiff got the first available appointment with her doctor on June 29, 2020.  She called Lipnisky back to inform her of the doctor's appointment and Lipnisky told Plaintiff that she would be placed on FMLA leave until then.

39.     Again, Plaintiff asked why she could not come in to do her PAT job since Mary Jo R. (l/n/u) was supposedly only hired as a PRN PAT.  Lipnisky told Plaintiff that Defendant could no longer accommodate her.  Plaintiff told Lipnisky that she would work any job with Defendant, even if it resulted in a pay cut, but Lipnisky told Plaintiff that there were none available, and Defendant could not accommodate her. Again, Plaintiff asked why she had to be on FMLA leave when she could work and Lipnisky told Plaintiff that she would discuss with Harris.

40.     Later that day, Plaintiff emailed Lipnisky and recapped their phone calls from earlier in the day. Once again, Plaintiff asked why she was not restored to her PAT position.  Plaintiff noted that, during her time in the PAT position, she was never told she had to cover or work the floor.  In fact, Plaintiff was told the opposite by both Harris and Kelley numerous times since moving into the position

in October 2017. That is why Defendant had so many PRN Registered Nurses; they were trained to work the floor if a RN called in sick. Moreover, Plaintiff noted that it made no sense that she would be placed on FMLA leave and, during this time, Mary Jo R. (l/n/u) would be performing her job, which she was completely capable of doing.

41.    On June 9, 2020, Plaintiff emailed Lipnisky and requested an in-person meeting to discuss her employment with Defendant and the process moving forward. Lipnisky never responded to Plaintiff's request.

42.    On June 12, 2020, Plaintiff emailed Lipnisky and asked if they could meet. Again, Plaintiff told Lipnisky that she knew Mary Jo R. (l/n/u) was performing her job and could not understand why she could not be given any justification from Defendant as to why Plaintiff was not permitted to do her PAT job. Furthermore, Plaintiff noted that only Medical Techs have been responsible for doing the temperature screenings that she was required to do on June 1, 2020 and told Lipnisky that she could not be forced to take FMLA leave when she could perform the essential functions of her job. Lipnisky did not respond and, as of June 15, 2020, Plaintiff was removed from the work schedule.

43.    On June 17, 2020, Plaintiff emailed Lipnisky again and noted that it was over two weeks since she was told to leave work, and no one contacted her from Defendant since June 8, 2020. Plaintiff noted that she knew that Mary Jo R.

(l/n/u) was performing her job full-time, no RNs had been scheduled to do temperature screenings, and that a PRN PAT position was posted on Defendant's website. Plaintiff asked for a truthful and honest reply, noted that she was the breadwinner in her family, and informed Lipnisky that she had to halt her child adoption process due to the uncertainty with her job. Finally, Plaintiff told Lipnisky that she felt like the situation was designed to make her quit her job, but that she refused to quit her job. Thereafter, Lipnisky responded: "Shelly and I have a conference consultation with an ADA specialist today and we will be getting back to you."

44.    On June 18, 2020, Lipnisky emailed Plaintiff and noted that she and Harris met with Defendant's "ADA consultant." Lipnisky stated that Defendant could not make an "informed evaluation" as to what accommodations that it could offer to Plaintiff until it received a diagnosis from Plaintiff's doctor. Lipnisky also referenced a doctor's note from January 9, 2020, that indicated that Plaintiff could not do any floor nursing work and further claimed that Plaintiff did not submit paperwork sent to her by Human Resources related to the January 9, 2020 doctor's note (at first, Plaintiff could not recall the paperwork, but later found the paperwork from her doctor that was submitted to Human Resources in January 2020). Lipnisky stated that Plaintiff needed to have the paperwork completed and Defendant would have "an assessment of your job duties against the paperwork

that we receive." Lipnisky further noted that it was "unfortunate" that Plaintiff could not get an appointment until June 29, 2020 and suggested that Plaintiff try to get an earlier appointment. Lipnisky further claimed that Defendant provided Plaintiff with "a sitting job" upon her return to work on June 1, 2020 and that Plaintiff informed Defendant that she needed "further accommodations" due to asthma and that Plaintiff could not "perform this job as other staff normally do." Lipnisky continued: "We are unclear if your leg issues will be a permanent condition. This is causing confusion since you reported to us that you needed a hip replacement that was to be done on June 16 and now deferred due to COVID-19."

45. That same day, Plaintiff responded to Lipnisky's email and clarified several of Lipnisky's assertions. First, on May 27, 2020, Harris never mentioned Plaintiff's asthma. Second, Plaintiff clarified that she was not told until the day that she returned to work that she would be required to go in and out of the building to update people on patient status. Third, Plaintiff told her that it was common knowledge that Plaintiff had hip replacement surgery scheduled and all of Plaintiff's supervisors were aware as early as the beginning of 2019. Fourth, Plaintiff explained that she attended Advanced Cardiac Life Support ("ACLS") on at least three different occasions in the past. Fifth, on June 3, 2020, Plaintiff did not call off, nor was she told by anyone at Defendant to stay home; rather, she was

sent home after beginning her shift. As she had on several prior occasions, Plaintiff stressed that Mary Jo R. (l/n/u) was performing her job and was not required to work on the floor and inquired why she could not be reinstated to her position. Additionally, Plaintiff reminded Lipnisky that, despite Defendant's policy, several employees were not wearing masks/proper PPE when she returned on June 1, 2020.

46.    On June 18, 2020, Jennifer Brown (Supervisor of Benefits, Human Resources) emailed Plaintiff the ADA accommodation paperwork for Plaintiff to provide to her physician.  Plaintiff followed up with Lipnisky and asked if she could define "other requirements."

47.    Additionally, on June 18, 2020, Plaintiff found on Defendant's website a job posting for a PRN As Needed PAT position on the day shift.  Under the "Physical and Mental Demands," it stated: "Ability to sit for long periods of time."

48.    On June 23, 2020, Plaintiff asked Lipnisky if she could provide Plaintiff with the job description Plaintiff signed in June 2018.

49.    On June 26, 2020, Lipnisky emailed the job description to Plaintiff.  It was the same job description that Plaintiff signed in 2018, including the same essential functions described above.

50.    That same day, Plaintiff sent a follow-up email to Lipnisky regarding a definition of "other requirements" since she had not responded to Plaintiff's June

18, 2020 email requesting the same.  Plaintiff also clarified that her physician faxed the ADA documents on January 27, 2020, despite Lipnisky's claim that they were never completed.

51.    On June 26, 2020, Lipnisky responded by providing Plaintiff with an email from Harris dating back to June 8, 2020.  This was the first time that Plaintiff saw the June 8, 2020 email.  Lipnisky's email stated that it was a list of "some of the additional essential duties required from all RNs in the ASC."  Harris' email claimed that these were "essential duties of all RNs no matter what the primary JD is . . ."  It listed seven bullet points with a variety of duties including housekeeping, working the floor for full days, helping in a variety of areas, and responding to patient emergencies.  Many of the bullets included duties that Plaintiff performed throughout her time as a PAT, while others were duties that are handled by others, including housekeeping and techs.  Of note, Plaintiff was neither scheduled nor requested to work the floor as a RN in pre-op/PACU since she was promoted to PAT.

52.    July 4, 2020 was a paid holiday for employees of Defendant.  Despite Plaintiff's status as an employee at the time, she was not paid by Defendant for the holiday.

53.    On July 6, 2020, Plaintiff provided Lipnisky with the ADA paperwork from her physician.  Plaintiff's doctor noted that she could perform the essential

functions of the job with a reasonable accommodation and specifically noted two limitations: (1) prolonged standing without sitting breaks and (2) permission to come inside the building due to excessive heat.  Additionally, Plaintiff's physician noted that Plaintiff would need a 10-minute sitting break after working 1 hour on the floor, as well as permission to come inside the building or inside of the sliding doors due to heat.  Lastly, Plaintiff's doctor addressed each of the 7 bullet points in Harris' email and noted whether Plaintiff needed accommodation and, if so, the type of accommodation.  Plaintiff's doctor also noted that it was all subject to change pending Plaintiff's response to hip surgery.

54.     On July 8, 2020, Plaintiff followed-up with Lipnisky and provided the ADA paperwork again.

55.     On July 9, 2020, Lipnisky emailed Plaintiff and attached a letter requesting a variety of clarifications related to the ADA paperwork completed Plaintiff's doctor.   The first page of the letter laid out three "concerns" that Defendant had, including Plaintiff being at risk for COVID-19, claiming that Defendant had "trouble getting you to perform other duties for some time," and that Plaintiff was "not acknowledging the real change that has occurred at the surgery center" since the coronavirus shutdown.   After laying out these "concerns," the accommodations set forth by my doctor were addressed: "The request you have made of having excessive breaks as an accommodation does

place a hardship on the operation of the ASC."   Lipnisky's letter continued by stating that, in order for Defendant to determine what type of accommodation it could offer, Plaintiff needed to provide clarification on when she would need 15-minute breaks versus 10-minue breaks.

56.    On July 10, 2020, Plaintiff responded to Lipnisky's letter and addressed the three "concerns" that Lipnisky raised.   First, Plaintiff noted that she was fine to return as she understood it was Defendant's policy that everyone wears a mask.   Plaintiff compared that to May 2020 when several staff were not wearing PPE.   Second, Plaintiff asserted that she never stated that she was "risking [her] health" doing anything other than a sitting job and, moreover, Plaintiff was never spoken to or reprimanded for not performing other duties.    Third, Plaintiff provided several examples of the "other essential duties" that she performed over the years without issue.   In terms of her breaks being "excessive," Plaintiff described with particularity how she could work through the variety of duties Lipnisky described while taking breaks and getting coverage.   Finally, Plaintiff addressed/clarified the additional questions that Lipnisky had regarding the ADA form submitted by Plaintiff's doctor and stressed that the sitting breaks were only for rare occasions where Plaintiff would have to cover for an RN who called out sick or if Plaintiff was called upon to clean or change a bed between patients.

57.     On July 10, 2020, Lipnisky emailed and stated that she received Plaintiff's clarifications and would review with Harris "and our consultant" after the weekend.

58.     On July 15, 2020, Plaintiff emailed Lipnisky and asked if they could have a resolution by the end of the week as Plaintiff had not heard back from anyone at Defendant.

59.     Later that day, Lipnisky forwarded Plaintiff an email from Harris that included Plaintiff's work schedule, starting on July 17, 2020.  Harris noted that Plaintiff would be working as "a full floor nurse on some days" because there was a "great need" on the floor.  Additionally, Harris stated that Plaintiff would have to coordinate her own breaks and that Defendant could not guarantee that it could meet Plaintiff's accommodation requests.  Interestingly, Harris noted that Plaintiff would not be able to work in the PAT office because there was already someone working in there.

60.     In reviewing the schedule in detail, Plaintiff realized a few things. First, Harris wanted Plaintiff to start on a Friday, which is typically the busiest day in terms of caseload.  Second, Plaintiff was being placed in the longer shifts and in roles that required significant walking during the shift.  Third, Defendant had Plaintiff doing PAT work in addition to the other nursing work, which would have made it extremely difficult to keep up with the requirements of the PAT position.

Concerned, Plaintiff scheduled an appointment with her physician to discuss the new work schedule.  When Plaintiff's doctor learned of the long hours that Defendant scheduled her, he was aghast.  As a result, he amended Plaintiff's ADA paperwork to reflect that Plaintiff would only be able to work a maximum of 2 hours if she was placed in walking floor nurse position.

61.    On July 16, 2020, Plaintiff submitted the updated ADA paperwork to Lipnisky.  Plaintiff also clarified her concerns from May 2020 and June 2020 regarding masks and staff wearing proper PPE as Lipnisky brought it up in her July 15, 2020 email.  Additionally, Plaintiff clarified the concern she had about her health when she returned to work on June 1, 2020 (specifically related to having to "run" in and out of the building to provide updates) because Lipnisky raised in her email as well.  Lipnisky responded, stating: "I am sorry that the accommodations we offered you are unacceptable.  We are going to review your amended restrictions and get back to you next week.  We will not be expecting you at work tomorrow."  Plaintiff responded that she was not refusing them, but they were outside of her physician's recommendations.

62.    On July 17, 2020, Plaintiff was terminated from her PAT position with Defendant.  Lipnisky sent Plaintiff an email stating that Defendant was unable to accommodate Plaintiff's updated request and stated: "Unfortunately these requested accommodations will not meet the essential functions of this

position . . ."  Lipnisky specifically referenced the floor nurse work and noted: "[Defendant] cannot reasonably agree to have one of our valuable RNs only work 2 hours a day on the floor with a 15 minute break each hour."  Lipnisky further claimed that she spent time trying to find an alternative RN position for Plaintiff that would require only a minimal amount of time on the floor but was unsuccessful.  Finally, Lipnisky noted that Defendant had 109 open positions that Plaintiff could apply for.

63.     During the entirety of these discussions with Defendant, the work schedules indicate that Mary Jo R. (l/n/u) was performing Plaintiff's PAT role full-time and Defendant posted a PRN PAT position.  Moreover, Plaintiff has knowledge that Mary Jo R. (l/n/u) was not required to work on the floor.  In terms of the temperature screenings, Defendant had techs performing that function according to the work schedules in early June 2020. In fact, on June 1, 2020, Plaintiff was asked by Kathy Hawkins and Shelby Gallagher why she was doing the screenings as Defendant always had techs doing them.

64.     Prior to the July 31, 2020 deadline, Plaintiff contacted Melissa Hruska (Human Resources) regarding an open Medical Assistant position but did not receive an opportunity to interview.  Dating back to June 3, 2020, Plaintiff asked Harris if any positions were available.  Harris told Plaintiff that she asked Human Resources, and nothing was available.  Additionally, on June 18, 2020, Defendant's

online career center had several jobs posted that Plaintiff could easily perform, including the PRN PAT position.

65.     Following her termination, Plaintiff went to retrieve her personal effects from Defendant and found that several items were missing.   Plaintiff emailed Lipnisky several times regarding the items but did not receive a response.

## COUNT I
## AMERICANS WITH DISABILITIES ACT – DISCRIMINATION

66.     Plaintiff, BRENDA FROHLIGER, re-alleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs one (1) through sixty-five (65).

67.     Plaintiff is an individual entitled to protection under the Americans with Disabilities Act, as amended, 42 U.S.C. §12112 *et seq*.

68.     Plaintiff is an employee within the meaning of the Americans with Disabilities Act, as amended.

69.     Plaintiff is an individual with a disability within the meaning of the Americans with Disabilities Act, as amended.  Specifically, Plaintiff's end-stage osteoarthritis, gait disturbance, chronic leg pain, fibromyalgia, and asthma substantially limited one or more major life activities including, but not limited to: standing, walking, sitting, bending, lifting, and working.

70.     Plaintiff was a qualified individual with a disability within the meaning of the Americans with Disabilities Act, as amended, because Plaintiff,

with or without a reasonable accommodation, could perform the essential functions of her job.

71.     By the conduct described above, Defendant engaged in unlawful employment practices and discriminated against Plaintiff on account of her known disability, and/or because Defendant regarded her as having a disability, and/or because of Plaintiff's record of having a disability in violation of the Americans with Disabilities Act, as amended. Specifically, Defendant:

> (a)    denied Plaintiff reasonable accommodations for her disabilities;
>
> (b)     did not compensate Plaintiff for a paid holiday (4th of July);
>
> (c)    terminated Plaintiff's employment; and
>
> (d)    denied Plaintiff re-employment.

72.     The above-described acts of disability discrimination constitute a violation of the Americans with Disabilities Act, as amended, for which Defendant is liable.

73.     Defendant's unlawful and discriminatory employment practices toward Plaintiff were intentional.

74.     Defendant's unlawful and discriminatory employment practices were done with malice or with reckless indifference to the federal-protected rights of Plaintiff.

75.     As a result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer damages.

WHEREFORE, Plaintiff prays for the following damages against Defendant:

 a. Back pay and benefits;

 b. Prejudgment interest on back pay and benefits;

 c. Front pay and benefits;

 d. Compensatory damages for emotional pain and suffering, inconvenience, loss of enjoyment of life and humiliation;

 e. Punitive damages;

 f. Attorneys' fees and costs;

 g. Injunctive relief; and

 h. For any other relief this Court deems just and equitable.

## COUNT II
## FLORIDA CIVIL RIGHTS ACT – DISABILITY/HANDICAP DISCRIMINATION

76.     Plaintiff, BRENDA FROHLIGER, re-alleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs one (1) through sixty-five (65).

77.     Plaintiff is an individual entitled to protection under the Florida Civil Rights Act, Chapter 760, *Florida Statutes*.

78.     Plaintiff is an employee within the meaning of the Florida Civil Rights Act.

79.     Plaintiff is an individual with a disability/handicap within the meaning of the Florida Civil Rights Act.   Specifically, Plaintiff's end-stage osteoarthritis, gait disturbance, chronic leg pain, fibromyalgia, and asthma substantially limited one or more major life activities including, but not limited to: standing, walking, sitting, bending, lifting, and working.

80.     Plaintiff was a qualified individual with a disability within the meaning of the Florida Civil Rights Act, because Plaintiff, with or without a reasonable accommodation, could perform the essential functions of her job.

81.     By the conduct described above, Defendant has engaged in unlawful employment practices and discriminated against Plaintiff on account of her known disability, and or because Defendant regarded her as having a disability, and/or because of Plaintiff's record of having a disability in violation of the Florida Civil Rights Act.   Specifically, Defendant:

(a)     denied Plaintiff reasonable accommodations for her disabilities;

(b)      did not compensate Plaintiff for a paid holiday (4th of July);

(c)     terminated Plaintiff's employment; and

(d)     denied Plaintiff re-employment.

82.     The above described acts of disability discrimination constitute a violation of the Florida Civil Rights Act, for which Defendant is liable.

83.   Defendant's unlawful and discriminatory employment practices toward Plaintiff were intentional.

84.   Defendant's unlawful and discriminatory employment practices were done with malice or with reckless indifference to the state-protected rights of Plaintiff.

85.   As a result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer damages.

WHEREFORE, Plaintiff prays for the following damages against Defendant:

    a.   Back pay and benefits;

    b.   Prejudgment interest on back pay and benefits;

    c.   Front pay and benefits;

    d.   Compensatory damages for emotional pain and suffering, inconvenience, loss of enjoyment of life and humiliation;

    e.   Punitive damages;

    f.   Attorneys' fees and costs;

    g.   Injunctive relief; and

    h.   For any other relief this Court deems just and equitable.

## COUNT III
## AMERICANS WITH DISABILITIES ACT – RETALIATION

86.   Plaintiff, BRENDA FROHLIGER, re-alleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs one (1) through sixty-five (65).

87.     Plaintiff suffered an adverse employment action for engaging in protected activity under the Americans with Disabilities Act, as amended. Specifically, Defendant retaliated against Plaintiff for requesting a reasonable accommodation for her disabilities under the Americans with Disabilities Act by:

(a)     not paying Plaintiff for a holiday (4th of July);

(b)     terminating Plaintiff's employment; and

(c)     denying Plaintiff re-employment.

88.     The above-described act of retaliation constitutes a violation of the Americans with Disabilities Act, as amended, 42 U.S.C. §12112 *et seq*.

89.     Defendant's unlawful and retaliatory employment practices toward Plaintiff were intentional.

90.     Defendant's unlawful and retaliatory employment practices were done with malice or with reckless indifference to the federal-protected rights of Plaintiff.

91.     As a result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer damages.

WHEREFORE, Plaintiff prays for the following damages against Defendant:

a.     Back pay and benefits;

b.     Prejudgment interest on back pay and benefits;

c.     Front pay and benefits;

d.      Compensatory damages for emotional pain and suffering, inconvenience, loss of enjoyment of life and humiliation;

e.      Punitive damages;

f.      Attorneys' fees and costs;

g.      Injunctive relief; and

h.       For any other relief this Court deems just and equitable.

**COUNT IV**
**FLORIDA CIVIL RIGHTS ACT — RETALIATION**

92.    Plaintiff, BRENDA FROHLIGER, re-alleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs one (1) through sixty-five (65).

93.    Plaintiff engaged in protected activity by opposing employment practices made unlawful by the Florida Civil Rights Act, Chapter 760, Florida Statutes ("FCRA"). Specifically, Plaintiff was retaliated against for requesting a reasonable accommodation for her disabilities.

94.    In retaliation for engaging in protected activity, Plaintiff suffered adverse employment actions by Defendant when Defendant:

(a)    not paying Plaintiff for a holiday (4th of July);

(b)    terminating Plaintiff's employment; and

(c)    denying Plaintiff re-employment.

95.    Stated differently, the adverse employment actions suffered by Plaintiff at the hands of Defendant is causally connected to his requests for reasonable accommodations for his disability.

96.    The aforementioned actions by Defendant constitute retaliation by Defendant in violation of the Florida Civil Rights Act.

97.    Defendant's unlawful and discriminatory employment practices were done with malice or with reckless indifference to the state-protected rights of Plaintiff.

98.    As a result of Defendant's unlawful retaliation, Plaintiff has suffered and continues to suffer damages.

WHEREFORE, Plaintiff prays for the following damages against Defendant:

    a.    Back pay and benefits;

    b.    Prejudgment interest on back pay and benefits;

    c.    Front pay and benefits;

    d.    Compensatory damages for emotional pain and suffering, inconvenience, loss of enjoyment of life and humiliation;

    e.    Punitive damages;

    f.    Attorneys' fees and costs;

    g.    Injunctive relief; and

    h.    For any other relief this Court deems just and equitable.

## COUNT V
## FAMILY AND MEDICAL LEAVE ACT -- INTERFERENCE

99.     Plaintiff, BRENDA FROHLIGER, re-alleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs one (1) through sixty-five (65).

100.    Plaintiff is an individual entitled to protection under the Family and Medical Leave Act (FMLA), 29 U.S.C. §2601, *et seq*.

101.    Plaintiff is an eligible employee within the meaning of the FMLA because Plaintiff worked for Defendant for twelve (12) months, had at least 1,250 hours of service for the Defendant during twelve (12) months immediately preceding her FMLA leave, and worked at a location where the Defendant had at least fifty (50) employees within seventy-five (75) miles.

102.    Defendant is a covered employer under the FMLA in that they had fifty (50) or more employees in twenty (20) or more work weeks in the current or preceding calendar year.

103.    Plaintiff suffered from serious health conditions within the meaning of the FMLA.

104.    Defendant's actions interfered with Plaintiff's lawful exercise of her FMLA rights.  Specifically, Defendant denied Plaintiff FMLA leave, used Plaintiff's FMLA leave as a negative factor in its employment decisions, and failed to restore Plaintiff to her position or a substantially equivalent position.

105.    Defendant's actions constitute violations of the FMLA.

106.    As a result of Defendant's unlawful actions, Plaintiff has suffered damages.

WHEREFORE, Plaintiff prays for the following damages against Defendant:

    a.    Back pay and benefits;

    b.    Prejudgment interest on back pay and benefits;

    c.    Front pay and benefits;

    d.    Liquidated damages;

    e.    Attorneys' fees and costs;

    f.    Injunctive relief; and

    g.    For any other relief this Court deems just and equitable.

## COUNT VI
## FAMILY AND MEDICAL LEAVE ACT -- RETALIATION

107.    Plaintiff, BRENDA FROHLIGER, re-alleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs one (1) through sixty-five (65).

108.    Defendant retaliated against Plaintiff in violation of the FMLA in that Plaintiff's request for FMLA leave, and the utilization of said leave was a substantial or motivating factor that prompted Defendant to take several adverse employment actions against Plaintiff, including:

    (a)    not paying Plaintiff for a holiday (4th of July);

    (b)    terminating Plaintiff's employment; and

    (c)    denying Plaintiff re-employment.

109.   Defendant's actions constitute violations of the FMLA.

110.   As a result of Defendant's actions Plaintiff has suffered damages.

WHEREFORE, Plaintiff prays for the following damages against Defendant:

    a.      Back pay and benefits;

    b.      Prejudgment interest on back pay and benefits;

    c.      Front pay and benefits;

    d.      Liquidated damages;

    e.      Attorneys' fees and costs;

    f.      Injunctive relief; and

    g.      For any other relief this Court deems just and equitable.

**DATED** this 27th day of July 2021.

                     **FLORIN GRAY BOUZAS OWENS, LLC**

                     */s/ Gregory Owens*
                     **GREGORY A. OWENS, ESQUIRE**
                     Florida Bar No.: 51366
                     greg@fgbolaw.com
                     **MIGUEL BOUZAS, ESQUIRE**
                     Florida Bar No.: 48943
                     miguel@fgbolaw.com
                     16524 Pointe Village Dr.
                     Suite 100
                     Lutz, Florida 33558
                     (727) 254-5255
                     (727) 483-7942 (fax)
                     *Trial Attorneys for Plaintiff*